## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

ZULMA VARGAS-MEDINA,

      Plaintiff,

      v.

ORTHO BIOLOGICS, LLC, et al.,

      Defendants.

Civil No. 15-2523 (ADC)

## OPINION AND ORDER

On, November 17, 2015, Zulma Vargas-Medina ("Vargas") filed a complaint against Ortho Biologics, LLC ("Ortho"),[1] claiming disability retaliation in violation of the Americans with Disabilites Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and related Puerto Rico statutes.[2] Plaintiffs seeks monetary and declaratory relief to remedy the alleged retaliation and her mental and emotional suffering.

On August 8, 2016, Ortho moved the Court to grant it summary judgment, **ECF No. 14**, and submitted its statement of uncontested, **ECF No. 13**. Vargas opposes the request for

---

[1] Plaintiff also named Johnson & Johnson Services, Inc., as a defendant. **ECF No. 1**. In the Joint Proposed Pre-Trial Memorandum and Schedule, the parties indicated that Johnson & Johnson "is a legal entity that does not conduct business in Puerto Rico and was not [Vargas's] employer. Thus, [Johnson & Johnson] is not a proper party to this case, and was not lawfully served with process." **ECF No. 8** at 1, n. 1. Vargas has not denied this statement, nor provided proof of service. Thus, the Court hereby notifies that it will dismiss the action against Johnson & Johnson pursuant to Federal Rule of Civil Procedure 4(m).

[2] Vargas brings claims under the following Puerto Rico statutes: Law No. 80 of May 30, 1976, P.R. Laws Ann. tit. 29, §§185a *et seq.*; Law No. 44 of June 2, 1985, P.R. Laws Ann. tit. 11 §§ 501 *et seq.*; Law No. 115 of December 20, 1991, P.R. Laws Ann. tit. 29, §§ 194 *et seq.*; and Law 45 of April 18, 1935, P.R. Laws Ann. tit. 11, §§ 7 *et seq.* **ECF No. 1.**

summary judgment, **ECF No. 27**, and submitted objections to defendant's statement of uncontested facts, **ECF No. 27-1**. With the Court's leave, **ECF No. 29**, Ortho filed a reply to Vargas's opposition, **ECF No. 33**, to which Vargas filed a sur-reply , **ECF No. 39, 40.**. The Court now **GRANTS** Ortho's motion for summary judgment, and **DISMISSES** the complaint, **ECF No. 1**.

I.    **Preliminary matters**

   A.    **Vargas's discrimination claims**

The complaint, discovery and much of the parties' motion practice hinged on Vargas's alleged disability—or lack thereof. However, Vargas's response in opposition to summary judgment clarifies that she "do[es] not have a cause of action for harassment and/or discrimination because of a disability or due to failure to provide a reasonable accommodation." **ECF No. 27** at 1-2. Instead, Vargas claims that Ortho retaliated against her after she requested reasonable accommodation and filed her discrimination complaints. *Id.* Accordingly, the Court **DISMISSES** plaintiff's claims of disability discrimination and failure to provide reasonable accommodation in violation of the ADA and Puerto Rico Law 44.

Nonetheless, a plaintiff "may assert a claim for retaliation even if she fails to succeed on a disability claim." *Freadan v. Metropolitan Property and Cas. Ins. Co.*, 484 F.3d 91, 106 (1st Cir. 2007) (citing *Soileu v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir. 1997). Thus, the Court will addresses Vargas's claims of retaliation.

B.      **Self-serving Affidavit**[3]

In an attempt to dispute certain facts alleged by Ortho in its statement of uncontested facts, Vargas submitted a sworn statement along with her opposition to summary judgment. **ECF No. 27-3**. Ortho argues that the sworn statement contradicts the answers Vargas gave during her deposition,[4] and that Vargas does not explain why she is changing her testimony. **ECF No. 33** at 5-6. Thus, Ortho asks that the Court not consider this affidavit in deciding the motion for summary judgment. *Id.* at 6.

"Where a party has given clear answers to unambiguous questions on discovery, that party cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory." *Escribano-Reyes v. Prof'l Hepa Certifacte Corp.*, 233 F.3d 49, 54 (1st Cir. 2016) (internal quotation omitted);  *see also, Xiaoyan Tang v. Citizens Bank, N.A.*, 821 F.3d 206, 217 n.11 (1st Cir. 2016). Here, the averments within the affidavit are either contradicted by plaintiff's deposition testimony or are irrelevant, and, as such, do not a create a valid factual dispute. Accordingly, the Court will not consider Vargas's sworn statement when it contradicts the clear record before the Court.

---

[3] This Court joins other fellow judicial officers who have expressed concern "with the recurrent litigation strategy employed by attorney [Anibal Escanellas-Rivera] of relying almost exclusively on post-discovery affidavits in opposing motions for summary judgment." *Rivera-Rivera v. Medina & Medina, Inc.*, ---F.Supp.3d---, No. CV 13-1889 (SEC), 2017 WL 108046, at *4 n.4 (D.P.R. Jan. 11, 2017) (citing *Reyes v. Prof'l Hepa Certificate Corp.*, 86 F.Supp.3d 79, 83 (D.P.R. 2015)) (collecting cases) (*aff'd sub nom.*, 817 F.3d 380 (1st Cir. 2016)).

[4] In the sworn statement in support of the opposition to summary judgment, plaintiff now asserts facts that are clearly contradicted by her deposition testimony. Among these facts are whether plaintiff was ever reported by co-workers as having an attitude or communication problems, whether she was ever disciplined on such grounds, or whether any sort of disciplinary action had been taken against her.

## II.   Factual Background

Unless otherwise noted, the following relevant facts are derived from defendants' statement of facts and plaintiffs' responses and objections thereto. *See* **ECF Nos. 13, 27-1**.

Ortho is a biopharmaceutical manufacturing plant located in Manatí. **ECF No. 13** at ¶ 1. On December 24, 2001, Vargas began working as an Associate Biotech Specialist in the Purification Area. *Id.* at ¶ 3, 5. While employed at Ortho, Vargas was temporarily relocated to other departments on various occasions in order to provide and receive cross-trainings. *Id.* at ¶13. The purpose of the cross-trainings was to expose all manufacturing employees to the different stages of the manufacturing process. *Id.* at ¶14.

In 2012, Ortho implemented a new operational model, reduced its workforce and provided more cross training to its employees. *Id.* at ¶¶ 17, 22, 23, 29, 30. Vargas was retained as a Biotech Associate I in the first shift of the Cell Culture/Purification crew. *Id.* at ¶23. On February 20, 2012, plaintiff was temporarily assigned to the second shift so that an associate from the second-shift could receive cross-training during the first shift. *Id.* at ¶31. On June 12, 2012, Vargas returned to the first shift and performed the same functions she had performed prior to her temporary reassignment. *Id.* at ¶32.

### A.   Vargas's Disciplinary Record

Vargas had a history of interpersonal and communication problems with her coworkers. *Id.* at ¶113. On February 8, 2002, Vargas signed a document agreeing to improve her communication with her co-worker Ricardo Vilmenay, an Electronic Tech. *Id.* at ¶33. On

February 26, 2003, Vargas signed a document in which she agreed to improve her interpersonal relationship with her co-worker María Silvestrini, Senior Biotech Specialist. *Id.* at ¶34.

During the "Voice of the Customer" interviews that took place between April and July 2012, Ortho interviewed thirty-four employees from the Manufacturing Department. At least eight of the employees expressed some sort of concern regarding Vargas's poor attitude and behavior towards her coworkers and supervisors. *Id.* at ¶36. In Vargas's 2012 mid-year performance evaluation, her then-supervisor, José Báez ("Báez"), commented that she had to give special attention to improving her communication and teamwork skills. *Id.* at ¶35.

### 1. October 2012 Suspension

On October 18, 2012, a gross deviation in the manufacturing process led to a multi-million dollar loss for Ortho.[5] *Id.* at ¶ 38. Ortho suspended all the employees involved in the incident, including Vargas. *Id.* at ¶39, 41. Specifically, on October 30, 2012, Vargas received a Final Written Warning and Suspension from Salary and Employment. *Id.* at ¶42.  Because of the incident, Ortho demoted Vargas's supervisor, Báez, from Supervisor to Senior Biotech Associate, and Báez no longer supervised her. *Id.* at ¶43.

On November, 2012, after Vargas returned from her suspension, Sara Hernández ("Hernández") became her supervisor. *Id.* at ¶44. Hernández had been Vargas's supervisor at different periods during Vargas's employment. *Id.* at ¶10. Hernández was Vargas's first

---

[5] Although the record shows the consequences of the "gross deviations in the manufacturing process," the parties do not go into detail about what the "gross deviations" consist of, nor the causes that prompted such deviation.

supervisor when she began working at Ortho in 2001, and remained her supervisor until 2007.
*Id.* at ¶11. Hernández also supervised Vargas from November 26, 2007, until January 2, 2008. *Id.*
*at* ¶¶ 15-16, 44. 66-69.

After the suspended employees returned to work, Ortho had an industrial psychologist,
Dr. Carlos Andújar Rojas, meet with the employees to help them cope with the one-month
suspension and return to work. *Id.* at ¶46. During the meetings with the psychologist, several
supervisors and employees expressed that Vargas was difficult and abrasive. They also stated
that Vargas was dismissive of them and treated them as if they were incompetent. *Id.* at ¶47.

### 2. Vargas's May 8, 2014, Report

Vargas had an amicable relationship with Hernández up until May 8, 2014. *Id.* at ¶51.
According to Vargas, Hernández's attitude towards her changed after May 8, 2014, when she
sent Hernández an email alleging that Hernández and Elvin García—another Biotech Associate
I who worked with Vargas—had deviated from the manufacturing process. *Id.* at ¶¶ 24-25, 48,
52. That same day, Hernández met with Vargas to address the concerns that she had raised in
her email. *Id.* at ¶49. During the meeting, Vargas stated the tasks were not distributed evenly
between García and her. Hernández told Vargas that she would address the situation. *Id.* at ¶50.

Vargas felt that Hernández was not addressing the alleged manufacturing deviations. *Id.*
at ¶53. Thus, a couple of days after May 8, 2014, Vargas gave López de Victoria ("López"), Senior
Manufacturing Manager, and Sandra Marrero ("Marrero"), Human Resources Manager, a
document that delineated the alleged violations committed by Hernández and García. *Id.* at ¶53.

López and Marrero met with Vargas to discuss her concerns regarding compliance with the manufacturing process. *Id.* at ¶54. Vargas does not know if Ortho investigated the concerns that she raised on May 2014. *Id.* at ¶56.

López investigated the alleged manufacturing deviations that Vargas brought to his attention and concluded that the alleged violations did not occur and that, in any event, they would not have been serious violations of Ortho's procedures. *Id.* at ¶57. Vargas continued receiving the same compensation after she reported the alleged deviations. *Id.* at ¶ 58. Hernández did not give Vargas additional tasks after she reported the alleged deviations. *Id.* at ¶59.

### 3. Hernández's October 30, 2014, Complaint

On October 30, 2014, Hernández complained to her supervisor, López, about Vargas's dismissive and disrespectful attitude towards her. *Id.* at ¶37.

### 4. The November 4, 2014, Incident

On November 4, 2014, the changing room was under repair and the employees had to put on their gowns in the manufacturing hallway. *Id.* at ¶63. On that day, both Vargas and Hernández—who still was Vargas's supervisor—complained to Human Resources about an incident that had occurred that morning. *Id.* at ¶60. The two employees had different versions about what had happened. *Id.*

Vargas sent María Ojeda ("Ojeda"), Human Resources Director at Ortho, and Marrero an email reporting the alleged incident with Hernández. *Id.* at ¶61. According to Vargas, she was

putting on the sterile gown required to enter the manufacturing area when Hernández intentionally pushed her. *Id.* at ¶62. A couple of hours later, Ojeda responded to Vargas's email and requested a meeting with her to discuss the situation. *Id.* at ¶64. Vargas believes that Hernández pushed her in response to her May 8, 2014, report regarding the alleged deviations in the manufacturing procedure. *Id.* at ¶65.

Hernández also reported the alleged incident. *Id.* at ¶66. Hernández expressed that when she was exiting the manufacturing area, Vargas was obstructing her way, and Hernández unintentionally grazed her arm. *Id.* at ¶67. Hernández reported that Vargas then raised her voice and called Hernández "stupid" ("bruta", in Spanish), disrespecting Hernández in front of other coworkers. *Id.* at ¶¶67-68.

Vargas admitted that she called Hernández, her supervisor, "stupid" ("bruta") on November 4, 2014. *Id.* at ¶69.

Ortho investigated both employees' allegations. *Id.* at ¶73. Ortho reviewed surveillance camera footage, but the cameras were too far away to aid in the investigation of the situation. *Id.* at ¶74. Ortho was not able to confirm Vargas's version that Hernández had intentionally pushed her. *Id.* at ¶75.

Ortho took several measures to address the November 4, 2014, incident. *Id.* at ¶76. Ortho assigned Hernández to a special project in another work area, so she would not interact with Vargas on a daily basis. *Id.* at ¶77. Thus, Carlos Colón ("Colón") began to supervise Vargas. *Id.* at ¶78. Additionally, Ortho contracted an industrial psychologist, Dr. Yarizel Rodríguez, to assist

both Vargas and Hernández in resolving their interpersonal issues. *Id.* at ¶79. Vargas met with the industrial psychologist on two occasions. *Id.* at ¶80. However, the meetings between the two employees and industrial psychologist were not held because Vargas went on a paid leave. *Id.* at ¶82.

Both Vargas and Hernández received a verbal warning for the November 4, 2014, incident. *Id.* at ¶83. In the verbal warning, Ortho warned Vargas that it could take additional disciplinary actions if similar situations took place. *Id.* at ¶84. Ortho also reminded Vargas that she could use Ortho's Employee Assistance Program ("PAE" for its Spanish acronym"), but she did not make use of this resource. *Id.* at ¶85. Vargas's work schedule and functions did not change after she received the verbal warning. *Id.* at ¶86.

### C.    The January 15, 2015, incident

On January 15, 2015, Vargas sent an email to María Ojeda ("Ojeda"), Human Resources Director at Ortho, and other officials. The email claimed that earlier that day, during a staff meeting in the manufacturing hallway, Hernández had walked past Vargas and physically assaulted her by pushing her. *Id.* at ¶87; **ECF No. 27-1** at ¶ 87. Vargas stated in her deposition that she considered Hernández's actions a physical aggression. *Id.*

On the same day, January 15, 2015, López and Marrero met with Vargas to discuss her alleged encounter with Hernández. **ECF No. 13** at ¶88. During the meeting, Vargas expressed that other employees had been present when Hernández allegedly pushed her, including Ángel

Soto, Orlando Domínguez, Francisco Rivera, and Elvin García. *Id.* at ¶89. Marrero told Vargas

that Ortho would investigate her allegations. *Id.* at ¶91.

> ### D.     Events after the January 15, 2015, incident

On January 16, 2015, Vargas sent a medical certificate to Ortho's Occupational Health

Services excusing her from work from January 15, 2015, until January 19, 2015. The medical

certificate also recommended that Vargas be transferred to another facility or plant due to the

alleged incidents with Hernández and the emotional toll it took on her. *Id.* at ¶92, 93; **ECF No.**

**27-1** at ¶92.

On January 20, 2015, Vargas returned to work, and Ortho's Occupational Nurse, Heidi

Pérez, met with her. In compliance with Company policy, the nurse provided Vargas with

Ortho's ADA forms for her psychologist to complete. **ECF No. 13** at ¶94. Because the medical

certificate indicated that Vargas's medical condition was work-related, the nurse referred Vargas

to the State Insurance Fund ("SIF") for an evaluation. *Id.* On January 20, 2015, Vargas was

evaluated by the SIF. *Id.* at ¶95. The SIF recommended that Vargas remain on leave until January

25, 2015, and that she continue receiving treatment during her leave. *Id.*

On January 26, 2015, Vargas returned to Ortho and delivered documents related to the

request for accommodation made in her January 16, 2016, medical certificate. *Id.* at ¶96. These

documents included her doctor's note, which were illegible. Thus, Marrero explained that

Vargas could not return to work until Ortho received a legible copy of her doctor's note in order

to understand what the requested accommodation was. *Id.* at ¶97. On January 28, 2015, Vargas

returned to her doctor, so he could fill out the documentation in more legible handwriting. *Id.* at ¶98.

Vargas requested an accommodation in the form of a permanent transfer to a facility closer to her hometown. *Id.* at ¶99. She attributed her request to the alleged assault incident with Hernández. *Id.* Upon receiving Vargas' legible ADA forms on January 28, 2015, Ortho commenced the process of evaluating her accommodation request. Meanwhile, Ortho's investigation of Vargas's allegations about the events of January 15, 2015, was ongoing. *Id.* at ¶100.

On January 29, 2015, Vargas filed two complaints. First, she called Ortho's internal hotline to complain that Marrero had not responded to her request for reasonable accommodation from January 15, 2015, and for which Vargas had submitted documentation on January 26, 2015. *Id.* at ¶101. Vargas also filed a complaint before the Equal Employment Opportunity Commission ("EEOC"). *Id.* at ¶102. Vargas alleges that she saw EEOC investigator Carlos González fax the discrimination charge to Ojeda and confirm that Ojeda received the charge. **ECF No. 27-1** at ¶102.

When Vargas filed these two complaints, Ortho's investigation into the January 15, 2016, incident was ongoing. **ECF No. 13** at ¶100. Vargas does not know the extent of the investigation that Ortho conducted about her January 15, 2015, complaint, nor when Ortho completed its investigation. *Id.* at ¶103.

Ortho officials commenced the investigation of the alleged aggression incident on the same day Vargas reported the alleged incident, January 15, 2016. *Id.* at ¶104. As part of the investigation, Ortho interviewed both Vargas and Hernández, as well as some of the employees that were present during the staff meeting, including Supervisor Colón. *Id.* at ¶105. All witnesses confirmed that they did not see Hernández physically assaulting Vargas. They also stated that Vargas was calm during and after the meeting, and that afterwards, she returned to her work area normally. *Id.* at ¶106. Additionally, Ortho officials reviewed the surveillance camera footage, which showed that the staff meeting went smoothly and that Hernández had not physically assaulted Vargas. *Id.* at ¶107. Based on a comprehensive review of the video footage, coupled with the eyewitnesses' factual accounts, Ortho concluded that the alleged incident did not occur, and that Vargas had made a false accusation against Hernández. *Id.* at ¶108.

### D.    Ortho's Policies

During her employment with Ortho, Vargas received Ortho's Employee Handbook. *Id.* at ¶140. Ortho has a policy that strictly prohibits discrimination and harassment on the basis of race, color, religion, sex, age, disability, among other protected classifications. *Id.* at ¶141. Ortho has a policy regarding reasonable accommodations to qualified individuals. *Id.* at ¶142. Employees who suffer discrimination or harassment have a duty to report such conduct to the Human Resources Department. *Id.* at ¶143. Ortho has a policy that prohibits retaliation against an employee for reporting or participating in an investigation of harassment. *Id.* at ¶144. Ortho has a Performance and Conduct Standards, Policy No. 3410, that describes Ortho's expectations

regarding employees' conduct and performance, and delineates the disciplinary actions that will be taken in response to violations of Company policies. *Id.* at ¶145. Ortho also has a policy prohibiting all types of violence and/or intimidation in the workplace, and Vargas acknowledged receipt of said policy on August 9, 2013. *Id.* at ¶152. Ortho is committed to a workplace free of violence. *Id.* at ¶109.

There are certain violations committed by employees that warrant suspension or immediate dismissal. *Id.* at ¶146. The Ortho's Performance and Conduct Standards, Policy No. 3410, states that Ortho considers lying during employment as conduct that may warrant suspension or termination. *Id.* at ¶110. Repeated violations are also a reason for dismissal pursuant to Ortho's Performance and Conduct Standards, Policy No. 3410. *Id.* at ¶111. Another violation that warrants suspension or immediate dismissal is insubordination, which the Performance and Conduct Standards define as an employee's refusal to comply with reasonable instructions given at work. *Id.* at ¶¶147, 148.

On December 5, 2008, Vargas acknowledged receipt of Ortho's Performance and Conduct Standards Policy, and affirmed that she was responsible for reading the same. *Id.* at ¶150. On November 12, 2014, as part of the November 10, 2014, verbal warning, Vargas acknowledged receiving another copy of the Performance and Conduct Standards Policy and it was discussed with her. *Id.* at ¶151.

E.    **Ortho's decision to dismiss Vargas**

On February 3, 2015, Ojeda and López met with Vargas to inform her that Ortho was terminating her employment. *Id.* at ¶114. Ojeda informed Vargas that the investigation revealed that Hernández had not physically assaulted her on January 15, 2015, as she had reported. *Id.* at ¶115.

Vargas is unaware of who made the determination to terminate her employment. *Id.* at ¶116. Vargas is unaware of when Ortho made the decision to terminate her employment. *Id.* at ¶117. Teresa Díaz ("Díaz"), former Operations Director; López, Senior Operations Manager; Ojeda, Human Resources Director; and Marrero participated in the decision to terminate Vargas's employment, and they all agreed with the decision. *Id.* at ¶118.

III.    **Summary Judgment Standard**

A party is entitled to summary judgment "when there is no genuine issue of any material fact on the record and that party is entitled to judgment as a matter of law." *Murray v. Warren Pumps, LLC*, 821 F.3d 77, 83 (1st Cir. 2016) (citations omitted); *see Fed.R.Civ.P.* 56(a). "An issue is genuine if it can be resolved in favor of either party, and a fact is material if it has the potential of affecting the outcome of the case." *Xiaoyan Tang*, 821 F.3d at 215  (internal quotation marks omitted). Although the Court states the facts in the light most favorable to the party against whom summary judgment is entered, *id.*, the Court is still required "to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Grp., Inc. v. Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001) (citation omitted).

In order to defeat a properly supported motion for summary judgment, the non-moving party must set forth facts showing that there is a genuine dispute for trial. *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011). In addition, when "the nonmovant has the burden of proof on a critical issue and the evidence that she proffers in opposition to summary judgment is so vague that she could not prevail at trial, the motion must be granted." *Pérez v. Volvo Car Corp.*, 247 F.3d 303, 318 (1st Cir. 2001) (citations omitted). Accordingly, the Court may "afford no evidentiary weight to conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative." *Tropigas*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)).

## IV.    Retaliation claims

The ADA "prohibit[s] employers from 'retaliating against persons who complain about unlawfully discriminatory employment practices.'" *Xiaoyan Tang*, 821 F.3d at 218 (quoting *Noviello v. City of Bos.*, 398 F.3d 76, 88 (1st Cir. 2005)). To succeed in a retaliation claim, a plaintiff must first make a prima face case of retaliation by showing that "she engaged in protected conduct, that she suffered an adverse employment action, and that a causal nexus exists between the protected activity and the adverse action." *Ponte v. Steelcase Inc.*, 741 F.3d 310, 321 (1st Cir. 2014). "Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to demonstrate that there was a non-discriminatory reason for the adverse employment action. If the employer demonstrates such a reason, the burden returns to the plaintiff to show that the non-discriminatory reason was merely a pretext for discrimination."

*Sánchez-Rodríguez v. AT&T Mobility Puerto Rico, Inc.*, 673 F.3d 1, 13–14 (1st Cir. 2012) (citing

*Douglas v. J.C. Penney Co., Inc.*, 474 F.3d 10, 14 (1st Cir. 2007)).

### A.    Vargas has established a prima facie case of retaliation

Ortho concedes that Vargas has established a prima facie case of retaliation, **ECF No. 14**

at 16-21, and a quick glance of the record and uncontested facts confirms this concession. First,

Vargas engaged in protected conduct by requesting reasonable accommodation and submitting

a complaint to Ortho's Human Resources Department and the EEOC. *See Xiaoyan Tang*, 821 F.3d

at 221. Second, Vargas's termination is an adverse employment action. *Id*. Finally, the temporal

proximity of Vargas's EEOC complaint on January 29, 2015, and her termination on February 3,

2015—a mere 5 days later—is sufficient to establish a prima facie causal nexus between the

adverse employment action and the protected activity. *See Carrero-Ojeda v. Autoridad de Energía

Eléctrica*, 755 F.3d 711, 720 (1st Cir. 2014).

Since Vargas has established a prima facie case of retaliation, the burden shifts to Ortho,

who must demonstrate that it had non-discriminatory reasons to terminate Vargas.

### B.    Ortho has proffered a legitimate, nondiscriminatory reason for dismissing Vargas.

"[I]n order to rebut the presumption that arises upon the establishment of a prima facie

case, the employer need only produce enough competent evidence which, if taken as true,

would permit a rational factfinder to conclude that the challenged employment action was taken

for a legitimate, nondiscriminatory reason[.]" *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 166 (1st Cir. 1998) (internal quotations and citations omitted).

Ortho claims that it decided to dismiss Vargas in light of her disciplinary record and because she violated Ortho's Performance and Conduct Standards by lying and falsely claiming that Hernández physically assaulted her on January 15, 2015. Ortho's investigation determined that Hernández did not assault Vargas, and that Vargas had fabricated the charges against Hernández. Thus, the investigation concluded that Vargas had violated Ortho's Performance and Conduct Standards, which provide that lying and insubordination warrant suspension or immediate dismissal, even for a first offense. *See* **ECF No. 13** at ¶¶145-149.

Ortho also considered Vargas's disciplinary record when it decided to terminate her. Vargas's disciplinary record includes the following. First, a verbal warning issued on November 10, 2014, in response to a November 4, 2014, incident in which Vargas raised her voice against Hernández, called her "stupid," and claimed that Hernández had pushed her. Ortho was unable to determine if Hernández had pushed Vargas or not. Second, Hernández's October 30, 2014, complaint to her supervisor about Vargas's dismissive and disrespectful attitude towards her. Third, a final warning and 30-day suspension for the gross deviation from manufacturing procedure on October 2012 that caused a significant loss to Ortho. Fourth, coworker's complaints between April and June of 2012 that Vargas had a poor attitude towards her coworkers and supervisors. Fifth, Vargas's 2012 mid-year evaluation, in which her supervisor, Báez, commented that Vargas had to improve her communication and teamwork. Finally, two

documents that Vargas signed, in which she acknowledged she had to and agreed to improve her communication with two coworkers. *See* **ECF No. 13** ¶¶ 33-37, 24, 151.

In short, the undisputed fact that Ortho concluded Vargas violated its policies by falsely accusing Hernández—along with her disciplinary record—would lead any reasonable factfinder to conclude that Ortho had legitimate reasons to dismiss Vargas. *See Hodgens*, 144 F.3d at 166.

### C.      Vargas fails to show that Ortho's proffered reasons for dismissing her are mere pretext

Because Ortho has demonstrated that it had non-discriminatory reasons to terminate Vargas, the burden returns to Vargas, who must show that Ortho's proffered reasons "[are] in fact a pretext and that the job action was the result of the defendant's retaliatory animus." *Román v. Potter*, 604 F.3d 34, 39 (1st Cir. 2010) (quoting *Enica v. Principi*, 544 F.3d 328, 343 (1st Cir.2008)) (internal quotations omitted); *see also Sánchez-Rodríguez*, 673 F.3d at 13–14.

"[T[here is no 'mechanical formula' for finding pretext." *Che v. Mass. Bay Transp. Auth.*, 342 F.3d 31, 39 (1st Cir. 2003) (quoting *Feliciano de la Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1, 6 (1st Cir. 2000)). However, the plaintiff "must offer some *minimally sufficient* evidence, direct or indirect, both of pretext and of [the plaintiff'] discriminatory animus." *Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*, 696 F.3d 128, 140 (1st Cir. 2012) (emphasis in the original) (quoting *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991). For example, a plaintiff can establish pretext "by showing weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons such that a factfinder could infer that the employer did not act for the asserted non-discriminatory reasons." *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir. 2000). Finally, retaliation claims "require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Abril-Rivera v. Johnson*, 806 F.3d 599, 608 (1st Cir. 2015) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2528, 186 L.Ed.2d 503 (2013).

Here, Vargas presents two primary arguments for why Ortho's proffered reasons are false and a pretext, or "at the very least, are in controversy." **ECF No. 27** at 6. First, Vargas argues that the close temporal proximity between Vargas's protected conduct and her termination establish that Ortho's proffered reasons are pretext. Second, Vargas tries to establish that there is a genuine issue of material fact as to the reason Ortho terminated Vargas. The Court addresses each argument in turn.

### 1. The temporal proximity between Vargas's protected conduct and her termination is insufficient to establish that Ortho's reasons are a pretext.

Vargas argues that the close temporal proximity between her filing of the complaint and her termination—5 days—shows that Ortho's reasons constituted mere pretext. However, "while temporal proximity is one factor from which an employer's bad motive can be inferred, by itself, it is not enough—especially if the surrounding circumstances undermine any claim of [pretext]." *See Carrero-Ojeda* 755 F.3d at 720 (holding that temporal proximity between complaint and dismissal was not sufficient proof of pretext, in the context of a Family and Medical leave

Act action, 29 U.S.C. §§ 2601-2654) (citing *Wright v. CompUSA, Inc.*, 352 F.3d 472, 478 (1st Cir.

2003)); *see also Steelcase, Inc.*, 741 F.3d at 322 (holding that, despite temporal proximity of two

months between complaint and dismissal, "the larger picture" undermined plaintiffs claims:

performance problems began before harassment incidents, performance complaints came from

other individuals besides the alleged harasser, and plaintiff admitted she had problems

performing her job).

Here, the circumstances surrounding Vargas's termination undermine her argument.

Ortho began investigating Vargas's complaint of assault as soon as she notified Human

Resources on January 15, 2015, well before they received notice of her discrimination complaints

on January 29, 2015. *See Xiaoyan Tang*, 821 F.3d at 221-222 (finding pretext when investigation

into incident began after employee filed her sexual harassment claims). There also is no evidence

that Hernández—or any other Ortho employee—actively sought to dismiss Vargas. *Cf.*

*Velázquez-Pérez v. Developers Diversified Realty Corp.*, 753 F.3d 265, 271 (1st Cir. 2014) (viewing the

evidence favorably to plaintiff, the Court of Appeals held that supervisor's efforts "served as a

proximate cause of [plaintiff's] discharge", because he gathered information on plaintiff's

performance before harassing her and emailed accusations against plaintiff, along with a strong

recommendation that she be dismissed). Finally, Ortho's investigation into the alleged January

15, 2015, incident concluded that Vargas lied and the alleged assault never occurred. This

violated Ortho's Performance and Conduct Standards and warranted her immediate dismissal.

*See* **ECF No. 13** at ¶110.

Furthermore, despite her claims to the contrary, Vargas had a disciplinary record, which Ortho also considered when it decided to terminate her. On November 10, 2015, Vargas received a verbal warning for an incident with Hernández. In that incident, Vargas called her supervisor "stupid" and claimed that Hernández had pushed her, although Ortho could not confirm Vargas's claims that Hernández had pushed her. On October 30, 2014, Hernández complained to her supervisor, López, that Vargas had been dismissive and disrespectful towards her. On October 30, 2012, Vargas received a Final Written Warning and suspension from Salary and Employment for her involvement in a manufacturing error that caused a multi-million dollar loss for Ortho. Between April and July, 2012, at least eight employees complained about Vargas's poor attitude and behavior towards her coworkers and supervisors. Finally, her then-supervisor commented on Vargas's 2012 mid-year performance evaluation that she needed to improve her communication and teamwork skills.

Thus, the Court finds that the circumstances surrounding Ortho's decision to dismiss her conclusively undermine her argument that temporal proximity shows Ortho's proffered reasons are pretext.

**2.  Ojeda's statements during the February 3, 2015, meeting**

Vargas also argues that Ortho's proffered reasons are a pretext because, during the February 3, 2015, meeting in which Ortho terminated her, Ojeda and López informed her "that she was being discharged because of her complaints against Hernández, which included the Discrimination Charge filed by Vargas before the EEOC, in which Vargas also complained

against Hernández." **ECF No. 27** at 6. Accordingly, Vargas argues that there is a genuine controversy as to why Ortho dismissed her.

Vargas sets up this argument by citing to her deposition, where she testified that Ojeda told her that the reason Ortho was dismissing her was that she falsely accused Hernández of assaulting her and "because of the constant complaints about Sara, to Sara Hernández . . . because of the constant complaints to Sara Hernández." **ECF No. 20-1** at 207:1-14. During the deposition, Vargas stated that the decision to terminate her was "a result of the investigations, the interview with other people, the complains I had taken [sic.] . . . they made the decision . . ., that I had not told the truth . . ., and that they, that was why I was being terminated, based on the. . ., on the complaints I made." **ECF No. 37-1** at 7:10-14. When pressed about what complaints Ojeda was referring to, Vargas answered that "[Ojeda] was referring. . . , based *on my understanding* . . . It's *my understanding*, the complaints I made against Sara . . . , because of the physical violence situations, the complaints I made at the [EEOC] office, at [Ortho's] hotline. . . Based on those complaints . . ., *I assume complaints* . . ." *Id.* at 7:17-25 (emphasis added).

Vargas's statements amount to nothing more than speculation about what information Ortho considered when it decided to dismiss her. More so when Vargas admitted that she did not know who made the decision to terminate her, when the decision was made, or all the factors that where taken into consideration to terminate her. **ECF No. 20-1** at 208:2-11. In contrast, it is an undisputed fact that Teresa Díaz ("Díaz"), former Operations Director; López, Senior Operations Manager; Ojeda, Human Resources Director; and Marrero participated in the

decision to dismiss Vargas's employment, and they all agreed with the decision. **ECF No. 13** at ¶118.

Vargas's deposition also shows that she has no direct knowledge of why Ortho dismiss her, and Vargas's arguments are are insufficient to show that Ortho's proferred reasons are pretext. *See Velázquez-García v. Horizon Lines Of Puerto Rico, Inc.*, 473 F.3d 11, 18 (1st Cir. 2007) (holding that, in order to survive a motion for summary judgment nonmovant's deposition testimony must "forth specific facts, within his personal knowledge, that, if proven, would affect the outcome of the trial") (citations omitted); *Santiago-Ramos*, 217 F.3d at 53.

> **3. Vargas argues that the alleged January 15, 2015, occurred, or that, at the very least, there is a genuine issue of fact as to whether the incident occurred or not.**

Finally, Vargas denies Ortho's conclusion that January 15, 2015 incident never occurred. In a final attempt that reveals the weakness of her argument, Vargas alternatively argues that there is a material issue of fact as to whether the January 15, 2015, incident actually occurred.

However, challenging the veracity of the employer's proffered reasons is insufficient to establish that they are a pretext. *Steelcase Inc.*, 741 F.3d at 323 (citing *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 824 (1st Cir. 1991)). "[I]nstead, a plaintiff must proffer specific facts that would enable a reasonable factfinder to conclude that the employer's reason for termination was a 'sham' intended to cover up the employer's true motive[,]" retaliation for the protected conduct. *Id.*

In support, Vargas claims that Ortho did not interview all of the employees that were present during the incident. **ECF No. 27-3** at ¶ 3. She further argues that after examining the

surveillance video of the incident it is "not possible to identify the employees that appear in the video and whether Hernández at any time pushed Vargas, since again, it was simply impossible to identify any of the employees that appear in the video and whether any incident occurred between Hernández and Vargas." **ECF No. 27** at 8.

Thus, these alleged facts do not go to the heart of Vargas's burden. "The pretext inquiry focuses on the employer, and whether the employer believed that its stated reason for the termination was credible." *Meléndez v. Autogermana, Inc.,* 622 F.3d 46, 53 (1st Cir. 2010); *see also Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 824 (1st Cir. 1991) ("In assessing pretext, a court's 'focus must be on the perception of the decisionmaker,' that is, whether the employer believed its stated reason to be credible.") (quoting *Gray v. New England Tel. and Tel. Co.,* 792 F.2d 251, 256 (1st Cir. 1986). Here, "[t]he question is not whether plaintiff's or his fellow employees' version is the true one, but whether [Ortho] believed what [it] had been told by those he interviewed. *Ronda-Pérez v. Banco Bilbao Vizcaya Argentaria-Puerto Rico,* 404 F.3d 42, 45 (1st Cir. 2005) (citing *Zapata-Matos v. Reckitt & Colman, Inc.,* 277 F.3d 40, 45-46 (1st Cir. 2002) ("[T]he ultimate question is not whether the explanation was false, but whether discrimination was the cause of the termination."); *Mulero-Rodriguez v. Ponte, Inc.,* 98 F.3d 670, 674 (1st Cir. 1996) ("[T]he issue is not whether [the employer's] reasons . . . were real, but merely whether the decisionmakers . . . believed them to be real.")). Moreover, "[p]retext means something worse than business error. It means deceit— a lie—to cover one's tracks. When assessing a charge of pretext, it must be shown that the employer did not honestly believe in the accuracy of the reason given for the action at issue."

*Echevarría v. AstraZeneca, LP,* 133 F. Supp. 3d 372, 403 (D.P.R. 2015) *(citing Ronda–Pérez,* 404 F.3d at 45; *Collazo–Rosado v. University of Puerto Rico,* 765 F.3d 86, 93 (1st Cir. 2014)).

After its investigation concluded that the incident never occurred, Ortho legitimately believed that Vargas's claim was false.  Thus, even if Vargas could show that Hernández had actually assaulted her, or create a genuine issue of fact as to whether Hernández assaulted her, that, in itself, would not refute the fact that Ortho genuinely believed that its reasons for dismissing Vargas were credible and legitimate. *See Meléndez v. Autogermana, Inc.,* 622 F.3d 46, 53 (1st Cir. 2010) (finding that arguing that employer misapplied sales-quota memorandum to dismissed employee did not show pretext, but could only show that dismissal was unjust or wrongful). It would also fail to show that Ortho was deceiving and hiding any retaliatory animus. *See Steelcase Inc.,* 741 F.3d at 323.

### 4. Vargas has failed to establish pretext

In sum, Vargas has failed to show "some *minimally sufficient* evidence, direct or indirect, both of pretext and of [the Ortho's] discriminatory animus." *Acevedo-Parrilla,* 696 F.3d at 140. She also failed to identify any "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Ortho's proffered legitimate reasons to terminate her.  *Santiago–Ramos,* 217 F.3d at 56. Finally, Vargas has failed to show that the filing of the complaints was the "but-for cause" of her termination. *See Univ. of Texas Sw. Med. Ctr.,* 133 S. Ct. at 2534. Ortho had a legitimate, non-discriminatory reason to dismiss her: in addition to a disciplinary record of prior issues and other violations, Vargas lied when she claimed that Hernández had assaulted her on

January 15, 2016, and Ortho's Performance and Conduct Standards provide that this violation may entail dismissal, even for a first offense. Ortho dismissed Vargas for legitimate, non-discriminatory reasons, and no reasonable juror could find that Ortho's proffered reasons for terminating Vargas masked a retaliatory animus.

Because Vargas has failed to show that Ortho's proffered reasons are a pretext, the Court finds that Ortho did not retaliate against Vargas and hereby **DISMISSES** her retaliation claim.

## V.    Vargas's Supplemental Claims.

Under 28 U.S.C. § 1367, "district court may decline to exercise supplemental jurisdiction" if "the district court has dismissed all claims under which it has original jurisdiction." 28 U.S.C. § 1367(c); *see González-De-Blasini v. Family Dep't,* 377 F.3d 81, 89 (1st Cir. 2004). Furthermore, "[a]s a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit . . . will trigger the dismissal without prejudice of any supplemental state-law claims." *Rodríguez v. Doral Mortgage Corp.,* 57 F.3d 1168, 1177 (1st Cir. 1995); *see also Roche v. John Hancock,* 81 F.3d 249, 256–257 (1st Cir. 1996).

Since Vargas's federal claims have been dismissed and there are no other grounds for jurisdiction, the Court declines to exercise jurisdiction over plaintiff's remaining Puerto Rico claims. *See Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 349, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) (explaining that the exercise of pendent jurisdiction is a matter of the federal court's discretion and not one of plaintiff's rights); *United Mine Workers v. Gibbs,* 383 U.S. 715, 725 (1966) (stating "if the federal claims are dismissed before trial, . . . the state law claims should be dismissed as

well."); *Martínez-Jordán v. Baxter Healthcare Corp.*, 608 F. Supp. 2d 224, 244–45 (D.P.R. 2009).

Accordingly, plaintiff's claims under Puerto Rico law are **DISMISSED.**

**VI.    Conclusion.**

Having the plaintiff failed to serve defendant Johnson & Johnson Services, Inc., all claims against Johnson & Johnson Services, Inc. are hereby **DISMISSED**.

In light of the above stated reasons, defendant's motion for summary judgment, **ECF No. 14**, is **GRANTED**, and the complaint is hereby **DISMISSED**. Plaintiff's claims of retaliation under the ADA and Puerto Rico Law 115 are **DISMISSED WITH PREJUDICE**. Plaintiff's remaining claims (ADA discrimination, Puerto Rico Law 44, Puerto Rico Law 45, and Puerto Rico Law 80) are **DISMISSED**. Furthermore, **ECF No. 35 and ECF No. 37** are **NOTED**.

The Clerk of Court is to issue judgment in accordance with this Opinion and Order.

**SO ORDERED**.

At San Juan, Puerto Rico, on this 30th day of March, 2017.

**S/AIDA M. DELGADO-COLÓN**
**Chief United States District Judge**